IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN A. DURHAM, | ) | CASE NO.  1:18-CV-02520-SL |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| WARDEN DAVE MARQUIS, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Respondent. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the Petition of Bryan Durham ("Durham" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Durham is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Durham*, Cuyahoga County Court of Common Pleas Case No. CR-14-585105-A.  For the following reasons, the undersigned recommends that the Petition be DISMISSED IN PART and DENIED IN PART.

## I.      Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts underlying Durham's conviction as follows:

{¶ 2} In May 2014, Durham was indicted by the Cuyahoga County Grand Jury for the following counts relating to the death of Herman Coleman ("Coleman"):

> (1) aggravated murder (R.C. 2903.01(A)) with a 1–year firearm specification (R.C. 2941.141(A)) and a 3–year firearm specification (R.C. 2941.145(A));

> (2) murder (R.C. 2903.02(B)) with a 1– and 3–year firearm specification;

> (3) felonious assault (R.C. 2903.11(A)(1)) with a 1– and 3–year firearm specification, a notice of prior conviction (R.C. 2929.13(F)(6)), a repeat violent offender specification (R.C. 2941.149(A)) in CR–92–283608, and a notice of prior conviction and repeat violent offender specification in CR–92–278596;

> (4) felonious assault (R.C.2903.11(A)(2)) with a 1– and 3–year firearm specification, 2 notices of prior conviction, and 2 repeat violent offender specifications; and

> (5) having a weapon while under disability (R.C. 2923.13(A)(2)).

{¶ 3} On January 27, 2015, Durham was convicted by the trial court, after waiving a jury trial on the issue, of having a weapon while under disability. He was convicted by the jury on all remaining counts, with the trial court determining that the repeat violent offender specifications would be considered at sentencing.

{¶ 4} On January 28, 2015, the parties agreed at the sentencing that counts 1, 2, 3, and 4 are allied offenses and that the 1– and 3–year firearm specifications merged. The state elected to have Durham sentenced on the aggravated murder count with 3–year firearm specification, for which Durham was sentenced to life with parole at 30 years plus a consecutive 3 years for the firearm specification. He received a concurrent 36–month sentence on count 5, having a weapon while under disability, with postrelease control advisement. Defendant timely appeals his convictions for aggravated murder, murder, and felonious assault.

### A. Trial

{¶ 5} At the trial, the state called approximately 29 witnesses and introduced several hundred exhibits. We summarize the evidence relevant to the issues raised in this appeal.

{¶ 6} On April 15, 2014, the body of Herman Coleman ("Coleman") was discovered by his ex-wife, Darlene Ware–Coleman ("Darlene"), and

friends Anthony Henderson ("Henderson"), and Jay Dempsey ("Dempsey"). The body was located behind a commercial building with a fenced yard, located at 16826 Miles Avenue, Cleveland, Ohio ("the property"). Coleman purchased the property in 2013 to start a tow truck business to supplement his regular income as a pharmacy technician and to support him during retirement. The coroner determined that Coleman was killed by a close range gunshot to the lower left jaw and calculated the time of death to be less than 24 hours from the coroner's arrival at the scene at 12:20 p.m. on April 15, 2014.

{¶ 7} According to Darlene, a 30–year postal service employee, though divorced, she and Coleman maintained a close relationship. After leaving the pharmacy, Coleman's habit was to have dinner at Darlene's house with Darlene and their daughter.

{¶ 8} Coleman hired Durham in 2013 to repair and rehabilitate the property in exchange for allowing Durham use of the warehouse to store his commercial construction vehicles and equipment. Coleman began to express his disappointment with Durham's conduct in March 2014 when Durham and his friend, Marcel Caver ("Caver"), went to a warehouse owned by a longtime friend of Coleman, James "Boochie" Willis ("Willis"), alleging that Caver's stolen truck was there ("truck incident"). The police were called but were unable to enter without a warrant. Someone broke through the door, but the truck was not located. Darlene said that Durham wanted Coleman to get involved and that Durham was upset because Coleman refused.

{¶ 9} Coleman also complained to Darlene that Durham and his friends would hang out at the property all hours of the day and night drinking alcohol. On April 14, 2014, Coleman told Darlene that he was going to ask Durham to move out, a decision embraced by Darlene. Coleman left Darlene's house about 7:30 p.m. to meet with Durham at the property.

{¶ 10} Darlene and Coleman normally telephoned each other at bed time and in the mornings; however, Darlene was unable to reach Coleman that evening and her attempts throughout the next morning were unfruitful. She left work early to go to the property. Darlene saw Coleman's white pick-up truck behind the locked building gate and called Coleman's brother, John Coleman ("John").

{¶ 11} John called Dempsey, and John went to check Coleman's house while Dempsey headed to the property to meet Darlene. Henderson was at the property when Dempsey arrived.

{¶ 12} On his way to the property, Henderson called Durham to ask if he had seen Coleman and to request that Durham open the locked gate, advising him that Darlene could see Coleman's truck behind the fence.

3

Durham said he had seen Coleman the night before but that Coleman left when it began raining. He also said that he was unable to come to unlock the fence because he was going to pick up his drain snake at a pawn shop.

{¶ 13} Dempsey showed Darlene and Henderson how to access the property through an adjacent fence. They found Coleman's body in the snow at the back of the property by the dumpsters, and called 911. Dempsey did not see any footprints in the snow.

{¶ 14} John arrived at the scene concurrently with Cleveland Police Department ("CPD") Officer Lee Davis ("Officer Davis"), and another officer. They climbed the fence and went to the back of the property where Coleman's body was lying. Later at the scene, John saw Durham sitting in the back of a police car and told him that they needed to talk. Durham focused on his cell phone and shook his head. John testified on cross-examination that his brother and Durham had keys to the property and he did not know if a third individual, Brian Gregory ("Gregory"), had a key also.

{¶ 15} Officer Davis went to high school with Coleman, and Durham was the half-brother of Officer Davis's deceased cousin. Officer Davis heard a "man down" dispatch broadcast and recognized the property address and responded with his partner. Durham called Officer Davis while he was on the way to the scene and told him something had happened at the shop. Officer Davis said he and John arrived concurrently and together ran to the area. He observed snow on Coleman's truck and body, but his primary focus was to prevent John, who was very emotional, from disturbing the scene.

{¶ 16} Officer Davis called Durham and told him that he needed to come to the property, but did not tell him Coleman had been located. The first time he saw Durham was later that morning when Durham was sitting in the back of a police car.

{¶ 17} Officer Davis also testified regarding the truck incident that transpired several weeks earlier involving Durham, Caver, Gerome Hardy ("Hardy"), who is also a relative of Officer Davis, and an unknown man. Officer Davis called a zone car from the CPD Third District who arrived at the scene and said there was nothing they could do except make a report. Officer Davis left them at the location with the zone car. He did not know why Caver thought his vehicle was there, did not know who owned the property, and there was no mention of Coleman.

{¶ 18} Thomas Ciula ("Ciula"), a forensic video specialist with CPD, accompanied CPD Detective Tom Lynch ("Detective Lynch") to the

O'Reilly Auto Parts Store located at the corner of Lee Road and Miles Avenue on April 22, 2014, to download and view the security video for April 14, 2014 from 4:00 to 10:00 p.m. that depicted the Lee and Miles intersection ("Lee and Miles").

{¶ 19} Ciula said that the fact the video clock was 4 years, 258 days, 3 hours and 47 minutes behind was not an unusual occurrence and his computer software was designed to sync the information to provide an accurate time reference for video review. Ciula walked through the processing and chain of custody. He delivered the results to Detective Lynch that depicted traffic activities at Lee and Miles from 7:55 to 8:03 p.m. on April 14, 2014. Ciula had not been given information about the case.

{¶ 20} Officer Ryan McMahon ("Officer McMahon") responded to a dispatch call to the crime scene to assist officers and emergency medical service personnel with securing the scene. Officer Eddie Robinson ("Officer Robinson") told Officer McMahon that several family members informed him that Durham was on the scene, and that Durham was the last person to see Coleman alive. Officer McMahon approached Durham, who was standing away from the family, and asked whether Durham would accompany him to speak with homicide detectives since he might be a witness. Durham agreed.

{¶ 21} Durham accompanied Officer McMahon to the police car to wait due to the cold weather. Officer McMahon said Durham entered voluntarily and was driven downtown to meet with homicide detectives. After the interview, Durham was driven to the Fourth District police station and released.

{¶ 22} Gerald Welker ("Welker") testified that he had known Coleman for three years and Durham for one and one-half. He had been to the property several times to work on equipment and perform bulldozing services. Welker became aware of issues between Coleman and Durham a couple of weeks before the murder. Coleman told Welker that he and Durham were in conflict about the clutter posed by Durham's dumpsters, rock piles, and foliage. Welker advised Coleman to give Durham 30–days to clean up or move out. He was also aware that Coleman did not like Durham and his friends drinking and hanging out at the property.

{¶ 23} Officer Martin Tate ("Officer Tate") accompanied Officer McMahon to the scene and assisted with securing the location. Officer Tate was sitting in the front seat of the zone car doing paperwork when Durham entered the back seat. Officer Tate's understanding was that Durham was going to be driven downtown to speak with detectives because he was one of the last people to see Coleman alive.

5

{¶ 24} Officer Tate overheard Durham telling someone via cell phone that Durham believed Coleman had been shot in the neck. The statement attracted Officer Tate's attention because he had been informed of the cause of death about 30 minutes earlier. Prior to that point, it had not been established.

{¶ 25} Officer Tate asked Durham how he knew that Coleman had been shot in the neck. Durham said he overheard a male talking about it, but he did not know who and could not identify the person. At that point, Durham had been in the car for approximately 15 to 20 minutes and was not under arrest. There was no further conversation between Officer Tate and Durham.

{¶ 26} Detective James Raynard ("Detective Raynard") with CPD Crime Scene Unit took a number of crime-scene photos that were introduced as evidence. He described the content of the photos including the presence of snow covering the decedent. A close up of the decedent's head showed suspected blood on the face, clothing, and snow. He testified the temperature dropped from 72 degrees on April 14, 2014, to 32 degrees on April 15, 2014.

{¶ 27} A copper bullet shell was located two feet north and three feet and ten inches east of the decedent's ankle and a plastic tipped cigar was on the ground near the body. Close-up photos of the decedent's face showed injuries to the left side of his face and neck. A cell phone was in the decedent's pocket and a ball cap was discovered under the snow when the body was moved. Additional photos showed beer and alcohol bottles in various locations.

{¶ 28} Detective Raynard also took photos on April 21, 2014, as a result of a search warrant for Durham's impounded 2001 green Ford Taurus. The car contained a number of items. Detective Raynard also conducted the gunshot residue collection ("GSR"). He explained the process and chain of custody but did not participate in the testing of collected particles.

{¶ 29} Gregory Parker ("Parker") testified that he knew Durham and a number of his friends. Parker met Coleman about two years before the incident. On April 14, 2014, Parker went to the property to pick up Clarence "Pudgie" Bryant ("Bryant") who was driving Parker's white truck. Parker planned to drop the truck off at Bryant's house. Afterwards, Bryant was to ride with Parker to a westside car lot owned by Parker.

{¶ 30} Parker arrived at the property about 5:00 p.m. Bryant was already there. Several people were around, talking and drinking alcohol, but Parker could not recall who. Parker left after about 40 minutes to meet Bryant who left to play the lottery.

6

{¶ 31} They dropped the white truck off and returned to the property in Parker's black truck at about 6:00 p.m. Parker believed Durham was driving his 2001 Taurus that day. There were more people at the property by that time. Tiant Nobles ("Nobles") and Wayne Ivory ("Ivory") were driving a red pick-up truck. Uncle Charlie Durham ("Uncle Charlie") was driving a red dump truck, and Hardy was driving a red pick-up truck.

{¶ 32} Parker testified that he pulled into the driveway behind Coleman who was just exiting his white truck. Coleman had Bryant pull Coleman's truck further into the driveway to create more room for Parker. Parker initially observed Coleman and Durham speaking in an area toward the back and right of the property. He did not hear any yelling and the two did not appear animated.

{¶ 33} Parker was having a beer and a drink also and entered into the first one of the four truck bays at the property. He saw Nobles and Ivory talking outside by their pick-up truck.

{¶ 34} While Parker was walking around, he noticed that he could no longer see Durham and Coleman. He believed they went behind the property. Parker walked back inside and was standing with Bryant, Uncle Charlie, and Hardy when he heard a sound that he thought was a wooden board cracking or something falling, but Bryant said, "I know a gunshot when I hear it. That was a gunshot." (Tr. 1054.)

{¶ 35} The group walked out to the driveway and, as they began walking to the back of the property, Durham emerged from the back and walked toward them. Parker asked Durham twice what was going on and Durham did not respond. Bryant also said something to Durham who still did not respond. Bryant then said "let's get the hell out of here," and everyone proceeded to leave. (Tr. 1055.)

{¶ 36} Parker confirmed that the only people behind the property were Durham and Coleman and that he did not see Coleman emerge from behind the property. He saw Durham lock the gate as he and Bryant were preparing to pull off. Coleman's truck was the only vehicle left inside the locked gate except for Durham's Chevy Suburban that was already parked there.

{¶ 37} Parker identified the vehicles depicted in the O'Reilly video excerpt of Lee and Miles, (1) Nobles's and Ivory's red pick-up; (2) Uncle Charlie's red dump truck; (3) Parker's black truck; (4) Hardy's red pick-up truck, whose company logo was discernible; and (5) Durham's Taurus. Parker believed the time frame of 7:55 to 8:00 p.m. to be accurate. The next day, Parker was returning from work when he saw the crime scene. Bryant called him and told him that Coleman was dead.

7

Parker did not voluntarily contact the police but met with the homicide detectives on April 15, 2014 or April 16, 2014, at their request, and made a written statement.

{¶ 38} Bryant testified to knowing Durham and Uncle Charlie for about 20 years, Parker for six years, Nobles and Ivory about 35 years, Hardy about six months, and Coleman for about six or seven months. Bryant frequently visited Durham at the property.

{¶ 39} Bryant arrived at the property about 9:00 or 10:00 a.m. on April 14, 2014, and worked with Durham to grease equipment and to break up old wooden pallets to burn. Bryant left to run an errand, returning about noon or 1:00 p.m. He, Durham, and Uncle Charlie began drinking a bottle of liquor, a six pack of beer, and eating lunch. Bryant was in and out of the property and so were various others. Several people stopped by around 4:00 and 5:00 p.m. Bryant drove Parker's white pick-up truck to the property about 4:30 p.m. and later left to play the lottery while Parker was still at the shop. Parker met him at the store; they dropped off the white truck and returned to the property.

{¶ 40} Bryant's description of those in attendance, and their vehicles, echoed those of Parker, except Bryant added that someone named Darryl was also present who he did not know. Another variance in recollection was that Bryant believed they returned to the property about 20 minutes before 8:00 p.m. and Coleman was not there. He had another beer and a shot of liquor and socialized.

{¶ 41} Bryant said Coleman arrived about fifteen minutes later and pulled his truck by Parker's. Coleman walked inside, shook everyone's hand, and then he and Durham began talking and walked outside. Bryant said he was not drunk at that time but "was feeling good." (Tr. 1116.) The entire group was drinking, except for Coleman.

{¶ 42} Coleman and Durham were standing where everyone was parked when Coleman asked Bryant to, "move my truck right quick, and I'm going to holler at Bryan [Durham], so I ain't blocking and my truck to get hit [sic]. I just got the truck." (Tr. 1118.) Coleman and Durham were talking but not arguing. They moved into the doorway of the property and then went back outside. A few minutes later Bryant and the others "heard a pop" (tr. 1121) and were discussing whether it was the wood that was being broken and burned, or a gunshot. Bryant believed it sounded like a gunshot. Bryant went outside towards Parker's truck and said, "I'm the eff out of here." (Tr. 1123.)

{¶ 43} Bryant also confirmed Parker's account of Durham coming from the back of the property after the shot, and failing to respond to inquiries

8

by the group about what was going on. He also saw everyone leaving and Durham close the gate.

{¶ 44} Bryant reviewed a crime scene video of the property. He recognized Coleman's truck but said he had not pulled the truck that far forward onto the property, that Durham's trailer should have been behind Coleman's truck, and stated the trailer was on the property when he left the night of the incident.

{¶ 45} Bryant identified the vehicles in the O'Reilly video including Durham's Taurus. He went home after the incident and began receiving calls in the morning about Coleman's death. Hardy told him where Durham was and took Bryant there to see him that evening. Bryant said that Durham touched Bryant's chest first, and commented about how things are "effed" up. "He was, like, you know, man, you know, this is really messed up, but, you know, I want to trust you, but I don't know who to trust right now." Bryant suggested that Durham contact a lawyer since people were saying he killed Coleman. (Tr. 1136 and 1137.)

{¶ 46} Bryant gave statements to FBI Special Agent Doug Williams shortly after learning of Coleman's death on April 15, 2014, Detective Lynch on April 15, 2014, and a second statement to Detective Lynch in June 2014. Bryant testified that his statements were consistent.

{¶ 47} On cross-examination, Bryant said he helped Durham work on the property. He corrected his earlier testimony that he went directly home after the incident because he and Parker went to Parker's car lot first, when he began calling Coleman. Bryant said the time was around 8 or 9:00 p.m.

{¶ 48} Bryant was questioned about "Meathead" and "Boochie" who he mentioned in his written statements. He replied that he ran into Meathead in May who told Durham he had been at the property on April 14, 2014, but Meathead was not there that evening and Bryant did not see him at any point that day.

{¶ 49} CPD Detective Dwayne Duke ("Detective Duke") specializes in cell phone and computer forensic data extractions and converts the data into reports using proprietary software. He extracted data from Kyocera and ZTE cell phones owned by Coleman. The last outgoing call was made to Durham on April 14, 2014 at 7:34 p.m. for a 37–second duration.

{¶ 50} Officer Todd Wiles ("Officer Wiles"), a certified crime analyst, analyzes police reports and 911 calls mapping crimes for patterns and trends analyses. He performed an analysis of the data secured from Detective Lynch and the records subpoenaed from Verizon for Durham's

cell phone, which included an itemized list of incoming and outgoing calls as well as cell tower information. From 5:53 p.m. forward, including the 7:34 p.m. incoming call from Coleman, the calls were picked up by the same cell tower, indicating the phone was stationery. After 8:24 p.m., the calls were handled by a different tower.

{¶ 51} Stefan Boseman ("Boseman") is co-owner of Uptown Towing & Recovery with Gregory. Boseman called Coleman "Uncle Herman." He met Coleman through the church when Boseman was a child, and said that Coleman was a positive influence and role model.

{¶ 52} Boseman met Durham when Coleman purchased the property. Durham would call Boseman to help him out at the property. He was there often and lived nearby. Boseman was given a key but was told to give it to Gregory because he was not responsible about locking up when he was away from the property.

{¶ 53} It was Boseman's experience that, whenever there was a difference of opinion between Coleman and Durham, they would talk it through. He said that Durham always carried guns at the shop—a revolver and a semi-automatic.

{¶ 54} Boseman was not at the property on April 14, 2014. Durham called at about 6:00 p.m. that day to invite him to the property to hang out and drink but he did not go. His cousin called him the morning of April 15, 2014 and told him about Coleman's death. Boseman called Durham several times but was unable to reach him. Durham called him back and said Coleman had been murdered at the shop.

{¶ 55} Durham was usually at the property in the evenings where he and others would eat and drink alcohol. Gregory was there frequently along with Uncle Charlie, Durham, Bryant, and Pete Durham ("Pete"). Coleman sometimes arrived after his day job, but did not stay long and did not drink.

{¶ 56} Gregory testified that he began storing his tow truck at the property about 18 months prior to the incident. Durham gave the property keys to Gregory as the result of an "altercation" between Durham and Boseman since Gregory did most of the tow truck driving. Coleman and Durham had door openers that provided access to the property. The keys only provided access to the gate to get into the yard. Gregory had a good relationship with Coleman and would sometimes ride to towing jobs with him or respond to calls in his own truck in Coleman's stead.

{¶ 57} Gregory went to the property on April 14, 2014 to retrieve tools from his truck at about 2:00 or 3:00 p.m. Durham was there with two

10

men whose names Gregory did not know but who he identified from a photo exhibit as Nobles and Ivory. Durham told Gregory that he was going to move his things out of the property and that his plow truck had already been moved.

{¶ 58} As substantiated by cell phone records, Gregory and Coleman talked several times that morning about resolving the issues between Durham and Coleman and how to move forward. Gregory advised Coleman to have a talk with Durham, and Coleman responded he was going to the property later that day. Gregory told Coleman to call him before he went to the property, but Coleman did not. Gregory returned to the property some time between 5:00 and 7:00 p.m. to return his tools. He was there for about five minutes and did not see Coleman.

{¶ 59} At 4:00 or 5:00 a.m., Gregory rode his son's bicycle to the property to get his tools because his wife had a flat tire and needed to drive to work. It was raining lightly. Both locks were on the gate. He unlocked the gate and started his truck that was in between the dumpsters and the back wall. He saw Coleman's truck, which he thought was odd, but he did not see Coleman's body. Gregory thought Coleman may have towed a car to Canton, which he had done before, though Coleman usually called Gregory to ride with him.

{¶ 60} Gregory put his bike onto the tow truck and left, relocking the gate. He did not see Coleman and did not look for him. He fixed the tire, went to bed, and was awakened by phone calls telling him that Coleman was dead. Gregory said he was shocked, and recalled receiving a call from Durham who asked if he knew Coleman was dead.

{¶ 61} Gregory also testified about the truck incident. He towed a truck that was parked in front of Willis's place to Caver's place on E. 93rd at Durham's request. Gregory met Willis previously but did not really know him.

{¶ 62} The truck situation was a point of dispute between Durham and Coleman. Durham allegedly called Coleman after "they apparently or supposedly tried to barge their way into Boochie's establishment, Mr. Durham supposedly had called Herman afterwards and asked Herman to call your friend Boochie, and tell him to let my friend have his truck." (Tr. 1339.) Gregory later informed John of the situation.

{¶ 63} Lisa Przepszny ("Przepszny") worked in the Trace Evidence Department of the Cuyahoga County Regional Forensic Science Laboratory. Przepszny examined the decedent's hands, body, clothing, and other crime scene evidence and issued a report. She determined that, based on the wound, the decedent was in close proximity to the weapon, and there was no evidence that his hands were in contact with a metal

object such as a gun. There was blood consistent with the decedent's injuries on his clothing. DNA sample swabs were taken and forwarded to the DNA Department.

{¶ 64} Przepszny also tested the GSR samples from Durham's vehicle. Spherical, molten particles containing lead, barium, and antimony are indicative of gunshot residue and were located on the driver's interior armrest, door handle, door release, and upper panel. Residue was also located from other areas including the driver's seat, headrest, and arm rest samples. Other sources for the presence of the chemicals were considered but ruled out based on the chemical constituent combination and shape of the particles. The Trace Evidence Department also examined and submitted for DNA testing a ball cap, vodka bottle, cranberry juice bottles, ten beer bottles, and a plastic cup taken from the vehicle.

{¶ 65} Przepszny testified on cross-examination that the samples were tested between June 18 and June 27, 2014. She had been informed that the suspect worked with vehicles at a garage and was involved with construction but not of his involvement with the scrapping business. There was also no indication or information that the car had been driven and parked by a police officer at some point or entered into by a tow truck driver. Przepszny reiterated on redirect that the shape of the particles and combination of chemicals indicated that the particles were gunshot residue.

{¶ 66} Sandra Pankey testified that she met Durham in December 2013, when he was sent to her home by the previous owner to repair her plumbing. They ultimately began an intimate relationship and he stopped by to visit a few times a week. Her residence was located near Judson and Lee Roads, a few blocks from Miles and Lee.

{¶ 67} On April 14, 2014, Pankey went to bed early at around 7:00 p.m. She was awakened by her children about 8:43 p.m. because their paternal grandmother called, but she did not recall speaking with her and dozed back off. Durham was not at her home at that time.

{¶ 68} Durham arrived about 15 minutes later. Pankey had difficulty going back to sleep because Durham was in and out of the bathroom, located just a few feet from her bedroom, running water. Durham told her that he was not feeling well because he had been drinking with Uncle Charlie at the property. Pankey had no idea what Durham was doing in the bathroom.

{¶ 69} Durham told her that his clothes, which were balled up in the corner by the door, smelled like smoke and asked her to wash them. She went back to sleep but, due to Durham's persistence, eventually took the

12

clothes to the basement to wash them at about 1:00 a.m. She washed a pair of socks, underwear, white "wife beater" sleeveless undershirt, white thermal shirt and pants, fleece-lined blue jeans, orange sweater with a "Perfect Concrete" logo, and his jacket and hat. The jacket and hat were already in the basement sanitary basin. Durham had never asked her to wash his clothing before. She did not see anything unusual on the clothing but did not check them.

{¶ 70} Durham's behavior that night was not typical. He usually took his shoes off when he entered her home, washed his hands, placed his coat on the back of a dining room chair and hung his pants on the door knob or door frame. It was also his habit to ask for something to eat but he did not want anything that evening. There was no attempt at intimacy, which she testified usually occurred about 99 percent of the time.

{¶ 71} Durham's Ford Taurus was parked behind her vehicle in the morning. Pankey left the house about 10:00 a.m. and passed the crime scene. She called Durham to inquire and he told her that Coleman was dead and the police were questioning everyone who had a key. He said he was sitting in a police car at the time. They talked for about two minutes. Durham later called her about 7:00 p.m. saying he needed a ride from the Fourth District because the police kept his car.

{¶ 72} Durham told Pankey that he gave her information to the police and that they would probably contact her to ask what time he had arrived at her home, about his clothes, and whether she had ever seen him with a gun. On the subject of the time, she stated, "I just through [sic] out a time. I said, Weren't you over about 9:30? He's, like No. He's like, if you say that, I'm hit." (Tr. 1422.)

{¶ 73} He told her that he arrived at her home about 6:00 p.m., that she was to deny washing his clothes and he brought up the subject of a firearm. Pankey said that she had seen Durham with a firearm numerous times, but the gun was always in his pants, hanging on a door knob or frame, so she did not see the entire gun and could not identify it.

{¶ 74} Durham and Pankey returned to her home and a heavy set dark-skinned guy with glasses came by who she identified from a photo to be Bryant. Durham went outside and walked away with Bryant. He returned alone about 11:00 p.m. driving a black Solara with a 30–day tag. Durham asked her whether she thought that he acted differently when he arrived on April 14 and she said that he had.

{¶ 75} On April 20, 2014, Pankey met with homicide detectives and signed a statement. She said that Durham did not exhibit any emotion when he told her that Coleman was dead. Pankey did not speak with

13

Durham after meeting with detectives. Pankey's testimony on cross-examination was consistent with that on direct.

{¶ 76} Laura Evans, M.S. ("Evans"), a forensic DNA analyst at the Cuyahoga County Medical Examiner's office, examined items of evidence for the Herman Coleman case and issued a report. The examination included DNA buccal swabs from Bryant, Parker, and Durham. Additional swabs were submitted for Nobles, Uncle Charlie, and Ivory in October 2014.

{¶ 77} The blood under Coleman's fingernails was his own. The alcohol and several beer bottles from Durham's auto contained DNA from Parker and Bryant. One beer bottle contained DNA from Durham. Other items contained DNA for persons unknown. There was no DNA detected for Nobles, Charlie Durham, and Ivory.

{¶ 78} The steering wheel, driver's door interior, handle release and gearshift of Coleman's truck revealed DNA from Coleman and Bryant. The DNA from the Lipton ball cap found at the crime scene belonged to Coleman.

{¶ 79} Hardy, Durham's stepbrother, testified that he also referred to Charlie Durham as "Uncle Charlie." Hardy, Coleman, and John had known each other for about 48 years. Hardy did not know Boseman, Nobles, Ivory, or Parker though he had heard some of their names. He had also heard of, and seen, Gregory and Bryant, but was not acquainted with them.

{¶ 80} Hardy visited the property several times and stored his motorcycle there two or three days before the murder. Hardy observed several others at the property during his visits but he did not know them. He arrived at the property about 3:30 or 4:00 p.m. on April 14, 2014. He saw Uncle Charlie, Durham, and a guy who he believed was called "Pudgie" there. (Tr. 1500.) They were all sitting around drinking vodka and beer.

{¶ 81} It began to get chilly so they broke up wooden pallets for fuel and started a fire in the gas burner. Others arrived while he was there and Coleman arrived later. At that point, Hardy believed there were about nine people present including Nobles and Parker, whom he identified from photo evidence.

{¶ 82} Hardy met Coleman outside of the property. Coleman hugged him, told him he was there to speak with Durham, and they entered the building together. Coleman began speaking with Durham. When Hardy turned around a little later, he did not see them and assumed they went outside. Hardy said he began running his motorcycle because he liked to

14

hear it run. They continued to drink and burn wood. Hardy and Uncle Charlie were the last ones in the garage. He said he did not hear a gunshot over the sound of his motorcycle.

{¶ 83} Bryant came into the garage and told everyone to get out, so Hardy left because, "when somebody tells you to get the [f* * *] out, you get the [f* * *] out." (Tr. 1509.) He was the first to pull out and, circled back around to check on Uncle Charlie who he saw leaving the area. Bryant also observed Durham leaving the property in his Taurus.

{¶ 84} Hardy reviewed the O'Reilly video, identified the vehicles that he recognized and thought that everyone left about 6:00 p.m., but admitted that it could have been almost 8:00 p.m. Hardy learned of Coleman's death the next morning when his cousin, Officer Davis, phoned him.

{¶ 85} Hardy said that he has seen Durham with a gun a number of times. He only testified because he was subpoenaed. After he left the property the night of the incident, he went home and did not return.

{¶ 86} Ivory testified that he and his brother, Nobles, went to school with Durham and had been friends for about 20 to 30 years. Ivory owns a landscaping business. Ivory and Nobles had been to the property a few times and had a few drinks with the group, but they did not go regularly.

{¶ 87} They went to the property on April 14, 2014, to pick up money from Durham for a trailer hitch that Ivory sold to him. They were riding in a red pick-up truck and parked at the side of the property facing Miles Avenue. It was the first time that Ivory had met Uncle Charlie, who was also at the property. In reviewing photo evidence, Ivory recognized that Bryant and Parker were also present.

{¶ 88} Ivory thought the property belonged to Durham. He, Nobles and Uncle Charlie were in the bay area talking and drinking. In addition to Bryant and Parker, others were present but he could not say who they were. At some point, someone said loudly that everyone needed to "get the F out of here." (Tr. 1550.) The person sounded serious and Ivory did not know who said it or why. He and his brother left along with the others. He did not collect his money from Durham. Ivory did not recall seeing Coleman's truck in the driveway. He did not hear a gunshot and thinks he recalled a motorcycle engine running.

{¶ 89} Ivory and Nobles went to Nobles's house after they left the building. Nobles said that something must have happened since they had to "get up and go leave like that." (Tr. 1559.) They talked a while and Ivory left. Bryant told him several days later that someone was killed that night at the building. Ivory talked with the police when contacted in October 2014.

15

{¶ 90} The majority of Nobles's testimony was consistent with that of his brother, Ivory. However, Nobles did not recall a motorcycle engine. Nobles also said that as he, Uncle Charlie, Ivory, and Bryant were exiting the building, he saw Durham coming toward them from the back part of the property. Nobles asked Durham whether he was "straight." Durham responded, "Yeah, I'm okay." (Tr. 1587 and 1588.) Nobles and his brother were the first to leave, and Nobles did not recall seeing Durham after that.

{¶ 91} Nobles called Durham to check on him about 8:43 p.m. Durham said that he was okay. Ivory was still with Nobles at the time. Parker and Bryant stopped by Nobles's house about 9:00 or 10:00 p.m. and the four of them talked about the gunshot, what happened that night and discussed the issue that had arisen between Coleman and Durham regarding the truck incident. Nobles learned about the murder the next morning. He spoke with detectives and made a statement when contacted a few months after the homicide.

{¶ 92} Caver owned a construction and concrete company and landscaping business. Caver's recollection was often vague, evasive, and ambiguous. He elaborated on the truck incident.

{¶ 93} Two years prior, a dump truck was stolen from Caver. He received a phone call that his truck had been located. Someone towed it to Caver's shop. Caver was not happy to recover the truck because it did not have wheels or doors and could not be used. In response to what role Durham played regarding the truck, Caver said Durham made a phone call in his presence to an unknown person and had a discussion about dumpsters, but there was no mention of Caver's dump truck.

{¶ 94} At some point, Durham took Caver somewhere on Woodland but he did not know whose place it was or when it occurred. They were there for about 15 minutes, and he did not see his truck.

{¶ 95} Caver was introduced to Coleman by Durham at a place called Mr. G's but that was his only contact with him. He was not aware of Coleman having anything to do with the dump truck. Caver was not at the building on April 14, 2014.

{¶ 96} Caver stated on cross-examination that he had only been to the place on E. 55th where his truck was located "that day." His former employee, Willie Jones, called him to tell him the truck was there. Durham was there. Officer Davis of the CPD and a couple of other officers also joined them. Caver does not remember any other calls being made.

{¶ 97} The next morning, Caver received a call from his brother informing him that his truck was parked on the street outside of the E. 55th address. It was towed to Caver's business location.

{¶ 98} Willis testified that he worked as a general contractor. Coleman was a life-long friend and they had been business partners for the past two years conducting tow truck operations and scrapping cars. Willis had also known Durham for about 20 years.

{¶ 99} Willis rents a warehouse at 6722 Bushnell. Durham called him and they met at the warehouse about four hours later, a couple of days before the murder. Durham had two guys with him. They first discussed the dumpsters that Durham was trying to sell and that Willis was considering buying.

{¶ 100} Durham told Willis that someone had seen his friend's dump truck at Willis's place. Willis told him there was no dump truck there. The guy with him, introduced as Caver, said someone told him the truck was there. Willis took Caver's number and said that, if he heard something about it, he would contact Marcel.

{¶ 101} Durham wanted to enter the building and Willis refused. Willis testified that Coleman was not there and had nothing to do with the situation. Everyone left but Caver called Willis to say that things had gone too far and the police were involved. When Willis returned to the location, Durham and Caver were there, the door to the building had been kicked in, the locks had been cut and three police cars were leaving. The truck was not located. Willis boarded the door. He denied ever having the truck and did not know how it ended up in front of his building the next day.

{¶ 102} Willis called Coleman and told him what transpired. Coleman was surprised. "Well, he couldn't believe it. I mean, as far as not happy, he was not angry. He had no reason to be angry." (Tr. 1649.) Someone told Coleman that Durham planned to put a lien on the property "because of whatever they had going" (tr. 651), but Willis did not know any details. Willis said Coleman had concerns about Durham. Durham was failing to pay rent and did not pay a workman with the cash that Coleman had given him for that purpose. Also, Coleman did not approve of Durham and his friends hanging out and drinking at the property while he was at work all day.

{¶ 103} Willis talked with Coleman the day before the incident for about 30 minutes at 2:29 p.m. on the day of the incident. Coleman planned to speak with Durham about going their separate ways and they discussed how Coleman should handle the situation. Coleman usually called Willis

17

in the morning before he went to work, but Willis did not hear from him the next morning.

{¶ 104} Willis tried to call Coleman on April 15 but was unable to go to the property due to medical concerns. When informed of Coleman's death, Willis talked with Darlene and Henderson about Coleman's plan to speak with Durham the prior evening about moving out.

{¶ 105} Charisse Harper ("Harper") testified that she is the mother of Durham's two children. They met in 2012 and dated until February 2014. She purchased a gun during the summer of 2012, moved it around the house once and twice, but said she had not seen it since shortly after she purchased it.

{¶ 106} The state introduced evidence of the gun purchase that identified it as a Taurus 650, Serial No. EX 57488 .357 revolver. Harper also purchased bullets but said that she never loaded the gun. Harper purchased the gun for protection. Durham knew about the gun but never asked for or handled it. Harper never reported the gun missing.

{¶ 107} Uncle Charlie testified that he was 79 years old and performed construction work under the name Charlie Durham & Sons. Charlie is Durham's uncle. His recollection was somewhat sketchy.

{¶ 108} Uncle Charlie said that he met Coleman a couple of years earlier. Uncle Charlie arrived at the shop before noon on April 14, 2014. He was driving his red dump truck. He picked up Durham and they drove to a business to sell scrap metal, purchased liquor, beer, and chicken, and returned to the property about 1:00 p.m. He drank whiskey and said he did not recall seeing Durham until he left later in the day because it was time to go home.

{¶ 109} Uncle Charlie also said that he took a route that did not include Lee and Miles when he left the property, yet identified his vehicle at the intersection in the O'Reilly video. He heard of Coleman's murder the day after it occurred.

{¶ 110} Homicide Detective Tom Lynch testified that he and Detective Sandoval responded to the scene. He was informed that a body covered in snow was behind the property with an undetermined source of trauma to the head. The medical examiner arrived approximately one hour later and determined the source to be a gunshot wound to the neck.

{¶ 111} Detective Lynch was advised that Durham and Gregory were already at the scene and were seated in separate zone cars. He interviewed Gregory in the zone car. Detective Lynch gathered background information regarding Coleman, ownership of the property, the business arrangement, and the relationship with Durham from John

and Gregory. Detective Lynch also talked with Henderson and Boseman. Gregory turned the property keys over also.

{¶ 112} The homicide lieutenant informed Detective Lynch that he had received a telephone call on the way to the scene. Based on that information, "[w]e felt that we definitely needed to speak with Mr. Durham." (Tr. 1756.)

{¶ 113} The detectives had the vehicles belonging to Coleman and Durham towed from the crime scene to an impound lot where they were placed in a secure building pending authorization to search. Personnel are not allowed to enter the vehicles due to the need to preserve evidence.

{¶ 114} Detective Lynch stated that since Durham was considered a potential suspect in a murder, state law requires that the suspect's interview be videotaped and that is why Durham was brought to the office. However, he said that Durham was not under arrest, could refuse to talk to them, and was free to leave at any time. Detectives Lynch and Sandoval interviewed Durham for three hours. The trial court allowed a slightly redacted version of the videotape to be played for the jury, as stipulated by counsel for the parties.

{¶ 115} Pankey was interviewed as Durham's alibi witness. Interviews of the individuals who Durham said were present were conducted as well as interviews of additional persons who FBI special agent Doug Williams said were present. After obtaining statements by Bryant and Parker about the events of April 14, 2014, and the "issue" between Coleman and Durham, a warrant was issued for Durham's arrest on April 16, 2014, and a search warrant obtained for the Taurus on April 18, 2014.

{¶ 116} Durham's phone records for April 14, 2014, revealed calls from several of the individuals present at the property that day. In addition to Coleman's call to Durham at 7:34 p.m., there was: (1) a 45–second call from Durham to Bryant at 7:09 p.m.; (2) a 52–second call from Bryant to Durham at 8:24 p.m.; (3) a 34–second call from Bryant to Durham at 9:03 p.m.; and (4) a 34–second call from Bryant to Durham at 9:04 p.m. (Tr. 1793 and 1794.) There were quite a few calls the morning of April 15, the majority of which were with Bryant and others who were present on the previous day. After Coleman's call to Durham, Coleman's records showed several missed incoming calls from Bryant between 8:00 and 8:11 p.m. A number of people attempted to contact Coleman on April 15, 2014.

{¶ 117} Detective Lynch also testified that the bullet shattered when it impacted the decedent's jaw so the ballistics examiner was unable to

19

determine whether it came from Harper's gun. The examiner was, however, able to determine that the copper casing fragment discovered at the scene was consistent with a 9 millimeter, a .38 Special, or .357 Magnum caliber ammunition.

{¶ 118} Defense counsel emphasized that neither the gun nor the ammunition that Harper purchased had been located. Durham's counsel then challenged the relevance of the O'Reilly videotape time stamp, pointing out that if Coleman called Durham at 7:34 p.m., it would take 15 minutes or so to get from the property to Lee and Miles.

{¶ 119} Defense counsel objected to the admission of the three-hour videotaped interview, stating he believed that a rights form should have been executed under the circumstances. The court interrupted his recitation, asking whether counsel had filed a pretrial motion to suppress. Counsel responded, "I did not on this because I did not need to due to the fact that the contention from the State of Ohio is that it was voluntary, and I'm just bringing it to the Court's attention that in these discussions with my client, he did not feel it was voluntary." (Tr. 1682.)

{¶ 120} Durham subsequently told his attorney that he did not feel it was voluntary so counsel was posing the objection. The judge determined that the failure to file the motion to suppress constituted waiver of the issue and added that he had not heard any testimony that indicated the statement was involuntary.

{¶ 121} The videotaped interview with Durham was played for the jury. Durham appeared to be cooperative and talked freely. Distilled, Durham said that he and Coleman had known each other since they were six years old and talked about how he came to work with Coleman at the property. Durham discussed the truck incident and said that the decedent and others were involved in questionable activities. According to Durham, Coleman told Durham that Willis and his friends were going to retaliate for the truck incident by breaking into the Miles property and that Durham had caused a lot of trouble. Durham said he did not know which one of the people involved in the truck incident could have killed Coleman.

{¶ 122} Coleman called Durham the morning of the homicide and told Durham they needed to talk and that he would see him at the property later. Durham said he and Uncle Charlie decided to leave the property about 6:00 p.m. or 6:30 p.m. Coleman called Durham to say he was coming to the property, but Durham told Coleman that he had waited for him all day and it was too late because he was no longer at the property. Durham said he went directly to Pankey's house and that is where he was the entire evening. When Durham and Uncle Charlie left, there was nobody else left at the property.

20

{¶ 123} Prior to closing arguments, the trial court denied Durham's motion for judgment of acquittal on all accounts pursuant to Crim.R. 29. The jury returned a verdict on January 23, 3015 finding Durham guilty on all counts. The trial court found Durham guilty on the remaining waived count. This appeal ensued.

*State v. Durham*, 2016-Ohio-691, 60 N.E.3d 552, 557-71 (Ohio Ct. App. 2016) (footnotes omitted).

## II.    Procedural History

### A.    Trial Court Proceedings

On May 9, 2014, the Cuyahoga County Grand Jury indicted Durham on the following charges: one count of aggravated murder (R.C. § 2903.01(A)), with firearm specifications (Count 1); one count of murder (R.C. § 2903.02(B)), with firearm specifications (Count 2); two counts of felonious assault (R.C. § 2903.11(A)(1) &(2)), each with firearm specifications and repeat violent offender ("RVO") specifications (Counts 3 and 4); and one count of having weapons under disability (R.C. § 2923.13(A)(2)) (Count 5). (Doc. No. 6-1, Ex. 1.) Durham entered pleas of not guilty to all charges. (Doc. No. 6-1, Ex. 2.) Durham waived a jury trial as to Count 5. (Doc. No. 6-1, Ex. 3.)

The case proceeded to jury trial in January 2015. (*See* Doc. No. 6-1, Ex. 4.) A mistrial was declared upon Durham's motion when only 11 jurors remained after *voir dire*. (*Id.*; Doc. No. 7-2 at 306-07.) The case proceeded to jury trial again later that month. (*See* Doc. No. 6-1, Ex. 5.) On January 21, 2015, after the State rested its case, Durham made a Crim. Rule 29 motion, which the trial court denied. (*Id.*) On January 22, 2015, after the defense rested, Durham made another Rule 29 motion, which the trial court denied. (Doc. No. 6-1, Ex. 6.) On January 23, 2015, the jury returned its verdict, finding Durham guilty on Counts One through Four, and the Court found Durham guilty on Count Five. (Doc. No. 6-1, Ex. 7.)

On January 28, 2015, the state trial court held a sentencing hearing. (Doc. No. 6-1, Ex. 8.) The parties agreed that Counts One through Four were allied offenses, and that the one-year and three-year gun

21

specifications should merge.  (*Id.*)  The State elected for Durham to be sentenced on the aggravated

murder conviction (Count 1) and the three-year firearm specification.  (*Id.*)  The trial court sentenced

Durham to life with the possibility of parole after 30 years, with a consecutive three-year term on the

firearm specification, concurrent to a three-year term for the weapons under disability (Count 5), for a

total sentence of life with parole eligibility after 33 years.  (*Id.*)

**B.**     **Direct Appeal**

Durham, through counsel, filed a timely notice of appeal to the Eighth District Court of Appeals.

(Doc. No. 6-1, Ex. 9.)  In his appellate brief, he raised the following assignments of error:

> I.      THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.
>
> II.     THE APPELLANT'S CONVICTIONS WERE NOT SUPPORTED BY
>         SUBSTANTIAL EVIDENCE.
>
> III.    THE APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST
>         WEIGHT OF THE EVIDENCE.

(Doc. No. 6-1, Ex. 10.)  The State filed a brief in response.  (Doc. No. 6-1, Ex. 11.)

On February 25, 2016, the state appellate court reversed Durham's aggravated murder conviction,

finding insufficient evidence of prior calculation and design, but affirmed Durham's convictions for

murder and felonious assault.  *State v. Durham*, 2016-Ohio-691, 60 N.E.3d at 571.  The state appellate

court remanded the case for resentencing on the murder and felonious assault counts, with specifications.

*Id.* at 581.

On February 29, 2016, the State filed a motion to stay resentencing pending conclusion of

appellate proceedings before the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 13.)

On April 11, 2016, Durham, through counsel, filed a Notice of Appeal with the Supreme Court of

Ohio.  (Doc. No. 6-1, Ex. 14.)  In his Memorandum in Support of Jurisdiction, Durham raised the

following Propositions of Law:

I.  *Where trial counsel fails to seek suppression or otherwise meaningfully challenge evidence obtained in violation of his client's constitutional rights, the legal representation he provides is ineffective under the State and Federal Constitutions.*

(Doc. No. 6-1, Ex. 15.)  The State filed a notice of cross-appeal.  (Doc. No. 6-1, Ex. 16.)  In its combined memorandum in response to jurisdiction and memorandum in support for cross-appeal, the State set forth the following propositions of law:

I.  An appellate court, when reviewing a challenge to the sufficiency of evidence, is required to draw all reasonable inferences in favor of the state's case and may not adopt the defense's inferences to reverse a conviction.

II.  A defendant's post-crime actions of concealing or destroying evidence are generally indicative of prior calculation and design and must be considered by an appellate court in a sufficiency review.

(Doc. No. 6-1, Ex. 17.)  Durham filed a memorandum in response.  (Doc. No. 6-1, Ex. 18.)

On June 29, 2016, the Supreme Court of Ohio declined to accept jurisdiction of the appeal or cross-appeal pursuant to S.Ct. Prac.R. 7.08(B)(4).  (Doc. No. 6-1, Ex. 19.)

**C.  Petition for Post-Conviction Relief**

On April 6, 2016, Durham, *pro se,* filed a timely petition to vacate or set aside judgment of conviction or sentence pursuant to O.R.C. §2 953.21, raising the following claim:

I.  In violation of 6th and 14th Amendment Rights

Supporting Facts: Counsel did not investigate, failed to file suppression motions, failed to call on witnesses to testify on behalf of defense, failed to view surveillance tape, failed to watch interviews[.]

(Doc. No. 6-1, Ex. 29.)  The State filed an opposition in response to Durham's petition.  (Doc. No. 6-1, Ex. 30.)  On May 5, 2016, the trial court denied the petition.  (Doc. No. 6-1, Ex. 31.)

Durham did not file an appeal challenging the trial court's denial of his post-conviction petition.

**D.     Application to Reopen Appeal under Ohio App. R. 26(B)**

On May 25, 2016, Durham filed a *pro se* Application to Reopen Appeal Pursuant to Ohio App. R. 26(B).  (Doc. No. 6-1, Ex. 32.)  Durham's Application asserted his appellate counsel was ineffective for failing to raise the following issues in direct review:

> I.   State did not prove any of the charges based on the evidence presented. Witnesses stated that Defendant was at the location with several vehicles. Counsel had incorrect information due to not speaking with client to be clear on facts.

(*Id*.)  In an affidavit attached to his Application, Durham argued "Counsel failed to investigate, interview witnesses, Failed to communicate with Defendant[,] minimal preparation, weak trial advocacy[,] little to no cross examination of witnesses, did not go over all discovery," and appellate counsel was deficient for failing to raise the issues raised in his Application.  (*Id.*)  The State filed a brief in opposition.  (Doc. No. 6-1, Ex. 33.)

On August 29, 2016, the state appellate court denied Durham's 26(B) application.  (Doc. No. 6-1, Ex. 34.)

Durham did not appeal the denial of his Application to Reopen to the Supreme Court of Ohio.

**E.     Resentencing**

On resentencing, the State elected to proceed with sentencing for the murder conviction (Count 2). (Doc. No. 6-1, Ex. 20.)  On August 11, 2016, the trial court sentenced Durham to life with the possibility of parole after 15 years, consecutive to a three-year term for the merged gun specifications, concurrent to a three-year term for the weapons under disability (Count 5), for an aggregate sentence of life with the possibility of parole after 18 years. (*Id.*)

Durham did not timely appeal the trial court's resentencing order.

**F.**     **Motion for Delayed Appeal under Ohio App. R. 5(A)**

On June 14, 2017, Durham, *pro se*, filed an untimely notice of appeal with the Eighth District Court of Appeals.  (Doc. No. 6-1, Ex. 21).  In his motion for leave to file delayed appeal, Durham stated his trial counsel failed to pursue an appeal of his resentencing entry despite his instructions to do so. (Doc. No. 6-1, Ex. 22.)  Durham argued this constituted ineffective assistance of counsel in violation of his Sixth Amendment rights and deprived him of his right to an appeal.  (*Id.* at 1-3.)  On June 20, 2017, the state appellate court denied Durham's motion for delayed appeal pursuant to App.R. 5(A), and *sua sponte* dismissed the appeal for failure to file a timely notice of appeal.  (Doc. No. 6-1, Ex. 23.)

On June 28, 2017, Durham filed an application for reconsideration under App. R. 26(A).  (Doc. No. 6-1, Ex. 24.)  On June 30, 2017, the state appellate court summarily denied Durham's application for reconsideration.  (Doc. No. 6-1, Ex. 25.)

On July 10, 2017, Durham, *pro se*, filed a notice of appeal to the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 26.)   In his memorandum in support of jurisdiction, Durham set forth the following proposition of law:

> I.    Appellant was denied his right to effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution when trial counsel disregarded Appellant's instructions to file a notice of appeal from the August 12, 2016 Journal Entry.

(Doc. No. 6-1, Ex. 27.)

On November 1, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).  (Doc. No. 6-1, Ex. 28.)

**G.**     **Federal Habeas Petition**

On October 25, 2018,[1] Durham filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

**GROUND ONE**:  FOURTH AND SIXTH AMENDMENT

**Supporting Facts**:

1. Petitioner was denied his right to effective assistance of trial counsel, as guaranteed by the Sixth Amendment under the United States Constitution, where trial counsel failed to file a motion to suppress Petitioner's statement made during a custodial interrogation while being held in a police zone car.

2. Counsel's performance fell below an objective standard of reasonableness where he failed to file a motion to suppress evidence seized from Petitioner's vehicle without a warrant, probable cause or a reasonable suspicion that criminal activity was afoot in violation of the Fourth Amendment.

**GROUND TWO**:  FOURTEENTH AMENDMENT

**Supporting Facts**:  The evidence is insufficient to show that it was possible for Petitioner to travel from a remote part of town to meet up with the victim, take him to the back of a warehouse, shoot him and clean up all traces of blood and DNA evidence within approximately 20 minutes. Although Petitioner was not convicted on the merged counts of murder and felonious assault the jurors returned guilty verdicts based on insufficient evidence. Petitioner was denied due process of law when the court refused to grant a motion for a judgment of acquittal.

**GROUND THREE**:  FOURTEENTH AMENDMENT

**Supporting Facts**:  Petitioner was denied due process of law when the court refused to grant a motion for judgment of acquittal where there was insufficient evidence to permit a rational fact finder to return a verdict of guilty. Petitioner was entitled to a new trial as the verdicts were against the manifest weight of the evidence.

**GROUND FOUR**:  FIFTH, SIXTH AND FOURTEENTH AMENDMENT

---

[1]   Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court for filing until October 31, 2018, Durham states that he placed it in the prison mailing system on October 25, 2018.  (Doc. No. 1 at 15.)  Thus, the Court will consider the Petition as filed on October 25, 2018.

**Supporting Facts**:  Petitioner was denied due process of law when the court sentenced and convicted him for murder on remand, as charged under count 2 of the indictment. Prior to his direct appeal Petitioner was tried and could be convicted of one offense only. Petitioner was first convicted of aggravated of aggravated [sic] murder only, as charged in count 1 of the indictment. The trial court did not sentence and convict Petitioner of additional counts of felony murder and felonious assault, because they were allied offenses of the same import as aggravated murder. Petitioner was denied effective assistance of appeal counsel at the remand hearing. Counsel failed to address court's plain error when it convicted him twice on the same offense. Moreover, counsel neglected to file an appeal to correct the void sentence.

(Doc. No. 1.)

On March 15, 2019, Warden Dave Marquis ("Respondent") filed his Return of Writ. (Doc. No. 6.) Durham filed a Traverse on May 17, 2019.   (Doc. No. 9.)

### III. Exhaustion and Procedural Default

#### A.    Legal Standard

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b), (c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).  A claim may become procedurally defaulted in two ways.  *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.; see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  If, due to petitioner's failure to comply with

27

the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2]  *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted.  *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition."  *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id.*

---

[2] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

28

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138–39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson*, 501 U.S.722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  *See also Jones v. Bradshaw*, 489 F. Supp. 2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 497 F. App'x 473, 480 (6th Cir. 2012).

## B.     Application to Petitioner

### 1. Grounds Two and Three

Respondent argues Grounds Two and Three[3] are procedurally defaulted because, while Durham raised these issues on direct appeal to the state appellate court, he failed to raise them in his appeal to the Supreme Court of Ohio.  (Doc. No. 6 at 27.)

Durham denies these claims are procedurally defaulted, asserting he "was mislead by his attorney on appeal where his claims were raised in the court of appeals and subsequently appeal counsel (a public defender) did not include these claims to the Supreme Court of Ohio on a discretionary appeal review." (Doc. No. 9 at 2.)  In addition, Durham states he filed an application to reopen his direct appeal, and "[t]he state court did not take this opportunity to hear Petitioner's claims [sic] ineffective assistance of appeal counsel on the merits.  There remains no further legal avenues available open [sic] to Petitioner Durhan [sic] to pursue his claims."  (*Id.*)

---

[3] In addition to raising a sufficiency of the evidence claim, Ground Three also raises a manifest weight of the evidence claim.  A manifest weight of the evidence claim is not cognizable on federal habeas review. *See, e.g., Nash v. Eberlin*, 437 F.3d 519, 524 (6th Cir. 2006); *accord Howard v. Tibbals*, No. 1:12 CV 1661, 2014 WL 201481, at *16 (N.D. Ohio Jan. 17, 2014); *Hess v. Eberlin*, No. 2:04-cv-1144, 2006 WL 2090093, at *6 (S.D. Ohio Jan. 17, 2006).  *See also Gibson v. Miller*, 5:15CV119, 2016 WL 6277229, at *1 (N.D. Ohio Oct. 27, 2016) ("[C]ontentions that a conviction is contrary to the manifest weight of the evidence also do not raise cognizable claims.").

The Court finds Durham's failure to present Grounds Two and Three to the Supreme Court of Ohio resulted in a procedural default.  Therefore, Grounds Two and Three are procedurally barred unless Durham "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  A habeas petitioner must "show that some objective factor external to the defense" caused his failure to comply with the state's procedural rule, *Murray*, 477 U.S. at 488, and if the petitioner fails to do so, the Court need not consider the prejudice prong.  *Smith v. Murray*, 477 U.S. 527, 533–34 (1986).

### a.  Cause and Prejudice

While the ineffective assistance of counsel can normally provide cause to excuse procedural default, "attorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which the petitioner was not constitutionally entitled to counsel, including a discretionary appeal."  *Barkley v. Konteh*, 240 F. Supp. 2d 708, 714 (N.D. Ohio Dec. 13, 2002) (citing *Coleman v. Thompson*, 501 U.S. 722, 751-53 (1991)).  Here, Durham had no constitutional right to counsel on a discretionary appeal to the Supreme Court of Ohio.  *Tanner v. Jeffreys*, 516 F. Supp. 2d 909, 916 (N.D. Ohio Oct. 19, 2007) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)).  Thus, any purported failure of his attorney in failing to raise certain issues on appeal to the Supreme Court of Ohio cannot serve as cause to excuse the procedural default.

The Sixth Circuit has held that cause to excuse the procedural default of a habeas claim may exist if a petitioner's appellate counsel was ineffective in failing to raise the issue.  *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004); *Smith v. Ohio, Dept. of Rehab. and Corr.*, 463 F.3d 426, 432 (6th Cir. 2006); *Berry v. Warden, Southern Ohio Corr. Facility*, 3:14CV2518, 2016 WL 4177174, at *3 (N.D. Ohio Aug. 8, 2016).  However, the underlying

31

claim of ineffective assistance of counsel must in and of itself not be in default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (finding unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim).

Even assuming the errors of appellate counsel Durham raised in his 26(B) application encompassed appellate counsel's failure to raise these arguments before the Supreme Court of Ohio,[4] Durham failed to appeal the denial of 26(B) application to the Supreme Court of Ohio. Durham offers no argument that there is cause and prejudice to excuse the procedural default of his ineffective assistance of appellate counsel claims. As a result, ineffective assistance of appellate counsel cannot serve as cause to excuse the procedural default of Grounds Two and Three. As Durham fails to show cause, the Court need not consider the prejudice prong. *Smith v. Murray*, 477 U.S. at 533–34.

### b. Actual Innocence

As noted above, a petitioner's procedural default may be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman*, 501 U.S. at 749–50. In order to establish actual innocence, a habeas petitioner must show "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. *See also Jones*, 489

---

[4] Durham's 26(B) application asserted a litany of errors committed by trial counsel, but only asserted the following assignments of error not considered on appeal as a result of appellate counsel's ineffectiveness: "State did not prove any of the charges based on the evidence presented. Witnesses stated that Defendant was at the location with several vehicles. Counsel had incorrect information due to not speaking with client to be clear on facts." (Doc. No. 6-1, Ex. 32.) Durham did not mention appellate counsel's failure to raise sufficiency and manifest weight of the evidence arguments before the Supreme Court of Ohio in his application. (*Id.*)

F. Supp. 2d at 807; *Allen*, 2012 WL 3711552, at \*7.  A petitioner must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327.  "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."  *Id*. at 316.

Here, Durham does not assert he is actually innocent.  (Doc. No. 1; Doc. No. 9.)  Nor does he present any new, reliable evidence of his innocence.  Therefore, the Court finds Durham has failed to demonstrate the procedural default of Grounds Two and Three should be excused on the basis of actual innocence.

### 2.  Ground Four

Respondent argues that Durham's claim that his resentencing was improper on remand from the state appellate court is a non-cognizable claim and is procedurally defaulted as it was not raised on direct appeal.  (Doc. No. 6 at 27-28.)

Durham again disputes his claim is procedurally defaulted but asserts ineffective assistance of appellate counsel constitutes cause to excuse the default.  (Doc. No. 9 at 3-7.)  He argues it was "incumbent upon appeal counsel to file an Anders brief" and appellate counsel's failure to do so "completely denied Petitioner the right to take and give effect to an appeal."  (*Id.* at 5, 9.)

Ten months after the state appellate court's decision reversing his aggravated murder conviction, affirming his murder and felonious assault convictions, and remanding for resentencing, Durham moved for a delayed appeal pursuant to App.R. 5(A), raising ineffective assistance of appellate counsel in failing to file an appeal challenging the resentencing as an explanation for delay and a constitutional violation. (Doc. No. 6-1, Ex. 22.)  However, Durham failed to raise any challenge to his resentencing that appellate counsel should have raised on appeal to the Supreme Court of Ohio.  (*Id.*)  Durham therefore failed to

fairly present his resentencing claim to the state courts for consideration. As a result, Ground Four is procedurally barred unless Durham can show cause and prejudice to excuse the default.

### a. Cause and Prejudice

As stated above, Durham argues appellate counsel's failure to file a brief under *Anders v. State of California*, 386 U.S. 738 (1967) constituted ineffective assistance of counsel that serves as cause to excuse his procedural default. (Doc. No. 9 at 5-7.) Ineffective assistance of counsel may serve as cause to excuse the procedural default of a claim if it rises to the level of a constitutional violation, but only if the underlying claim of ineffective assistance of counsel is not itself defaulted. *See Edwards*, 529 U.S. at 453.

Here, Durham filed an application to reopen his appeal under Ohio App. R. 26(B) on May 25, 2016, which preceded his resentencing. (Doc. No. 6-1, Ex. 20, 32.) Ohio law does not provide for second or successive 26(b) applications to reopen in any instance. *Warman v. Buchanan*, No. 2:180cv0564, 2019 WL 3491268, at *4 (S.D. Ohio Aug. 1, 2019), *report and recommendation adopted by* 2019 WL 6974393 (S.D. Ohio Dec. 20, 2019). *See also, e.g., State v. Richardson*, 74 Ohio St.3d 235, 1996-Ohio-258. 658 N.E.2d 273 (Ohio 1996); *State v. Cheren*, 73 Ohio St.3d 137, 1995-Ohio-28, 652 N.E.2d 707 (Ohio 1995); *State v. Peeples*, 73 Ohio St.3d 149, 1995-Ohio-36, 652 N.E.2d 717, 718 (Ohio 1995); *State v. Cooey,* 99 Ohio St.3d 345, 2003-Ohio-3914, 792 N.E.2d 720, ¶5 (Ohio 2003) ("'Neither App.R. 26(B) nor *State v. Murnahan* (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204, provides a criminal defendant the right to file second or successive applications for reopening.'") (internal citations omitted).

As set forth above, after resentencing, Durham did file a motion for delayed appeal pursuant to App.R. 5(A). (Doc. No. 6-1, Ex. 22.) The state appellate court summarily denied Durham's motion for delayed appeal and *sua sponte* dismissed the appeal as untimely. (Doc. No. 6-1, Ex. 23.) Durham filed an application for reconsideration, which the state appellate court denied. (Doc. No. 6-1, Ex. 24, 25.) Durham appealed to the Supreme Court of Ohio, which declined jurisdiction. (Doc. No. 6-1, Ex. 26-28.)

"[A] petitioner's failure to follow Ohio Rule of Appellate Procedure 5(A) can serve as the basis for a procedural default of a petitioner's habeas claims."  *Stone v. Moore*, 644 F.3d 342, 348 (6th Cir. 2011). In *Stone*, the Sixth Circuit found:

> In this case, Petitioner waited six years before moving for delayed appeal pursuant to Rule 5(A). Both the Ohio Court of Appeals and the Ohio Supreme Court denied Petitioner's Rule 5(A) motion as untimely. Notwithstanding Petitioner's delay, the Ohio courts had discretion under Rule 5(A) to permit Petitioner's delayed appeal. However, based on *Walker*'s holding that discretionary state procedural rules can serve as an adequate and independent state ground for denying a petitioner's habeas claim, Petitioner's failure to promptly file his Rule 5(A) motion constituted procedural default. This Court is therefore foreclosed from considering Petitioner's habeas claims.

*Id.*

Durham waited ten months before moving for a delayed appeal.  The state appellate court summarily denied his motion.  (Doc. No. 6-1, Ex. 23.)  Where a state court decision is silent as to the reasons for denying a claim, the Court assumes that the state court observed and enforced the procedural bar.  *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996).  In a separate entry, the state appellate court ordered: "Sua sponte, this appeal is dismissed at appellant's cost for failure to file a timely notice of appeal. See App.R. 4(A)."  (Doc. No. 6-1, Ex. 23.)  The Court finds the *Maupin* factors are met and Durham's ineffective assistance of appellate counsel claims are procedurally defaulted.[5]  Thus, any

---

[5] Even if this claim was not procedurally defaulted, the Court agrees with Respondent that Durham appears to misunderstand allied offenses and the state appellate court's decision on direct appeal.  (Doc. No. 6 at 27.)  The jury convicted Durham of aggravated murder, murder, and felonious assault, and the parties agreed these counts were allied offenses.  (Doc. No. 6-1, Ex. 8.)  After the state elected to proceed with sentencing on aggravated murder, the trial court sentenced Durham accordingly.  (*Id.*)  On appeal, the state appellate court reversed Durham's conviction for aggravated murder but affirmed his convictions for murder and felonious assault and remanded for sentencing.  *State v. Durham*, 2016-Ohio-691, 60 N.E.3d at 581.  On resentencing, the trial court found the murder and felonious assault counts to be allied offenses.  (Doc. No. 6-1, Ex. 20.)  The state elected to proceed with sentencing on the murder count, and the trial court sentenced Durham accordingly.  (*Id.*)  As a result, even assuming this claim is cognizable on habeas review, it is without merit.

suggestion that ineffective assistance of appellate counsel provides cause to excuse the default of this claim is without merit because any underlying ineffective assistance of counsel claim is itself defaulted.

### b. Actual Innocence

As set forth above, Durham does not assert he is actually innocent.  (Doc. No. 1; Doc. No. 9.)  Nor does he present any new, reliable evidence of his innocence.  Therefore, the Court finds Durham has failed to demonstrate the procedural default of Ground Four should be excused on the basis of actual innocence.

### IV. Review on the Merits

**A.      Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir.2005).  Indeed, the Supreme Court has indicated that

circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012). *See also Lopez v.Smith*, —— U.S. ——, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838 F.3d at 695. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence

in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87. This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### 1. Ground One

In Ground One, Durham argues he was denied his right to the effective assistance of counsel under the Sixth Amendment when trial counsel failed to file a motion to suppress his "statement made during a custodial interrogation while being held in a police zone car" and failed to file a motion to suppress "evidence seized from [his] car without a warrant, probable cause or a reasonable suspicion that criminal activity was afoot in violation of the Fourth Amendment." (Doc. No. 1 at 5.)

Respondent argues, "[E]mploying the double deferential standard of *Strickland* under the lens of AEDPA review, the state court's decision demonstrates ample reasonable arguments that counsel's decision to not file a meritless motion to suppress satisfied *Strickland*'s deferential standard and therefore, was not constitutionally deficient. This ground must be dismissed in its entirety because the state court's reasonable rejection of this issue is entitled to AEDPA deference." (Doc. No. 6 at 43.)

The record reflects Durham raised these ineffective assistance of trial counsel claims on direct appeal to both the state appellate court and the Supreme Court of Ohio.[6] (Doc. No. 6-1, Ex. 10, 15.) The state appellate court addressed these claims as follows:

> {¶ 163} We now address Durham's remaining assignment of error, that defense counsel's failure to file a motion to suppress the three-hour interview with homicide detectives conducted without a *Miranda* warning, and the seizure and search of Durham's car constitutes ineffective assistance of counsel. We disagree.
>
> ### 1. Standard of Review
>
> {¶ 164} In order to substantiate a claim of ineffective assistance of counsel, the appellant must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judicial scrutiny of defense counsel's performance must be highly deferential. *Strickland,* 104 S.Ct. at 2065. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun,* 86 Ohio St.3d 279, 714 N.E.2d 905 (1999).
>
> ### 2. Analysis
>
> {¶ 165} The failure of trial counsel to file a motion to suppress "does not constitute per se ineffective assistance of counsel." *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)." *State v. Neyland,* 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 126. A defendant must prove that there was a basis to suppress the evidence in order to establish ineffective assistance of counsel. *State v. Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837, 873

---

[6] The Court notes Durham worded his claim about his statement differently than his attorneys did before the state appellate court and the Supreme Court of Ohio. (Doc. No. 6-1, Ex. 10 at 24-25) ("In the case at hand, appellant submits that it was ineffective of his trial counsel to fail to file a motion to suppress the appellant's statement given during a three-hour custodial interrogation without Miranda warnings being advised . . . ."); (Doc. No. 6-1, Ex. 15 at 5) ("Mr. Durham maintains that trial counsel's failure to seek suppression of statements he made during a 3-hour custodial interrogation undertaken without *Miranda* warnings . . . rendered him ineffective."). The Court construes Durham's habeas petition broadly and determines this is essentially the same claim Durham raised on direct appeal to the state appellate court and the Supreme Court of Ohio, particularly since Respondent asserts Durham raised these claims below and addresses them on the merits. (Doc. No. 6 at 33.)

N.E.2d 858, ¶ 65, citing *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 35.

{¶ 166} An appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion where the record "contains no evidence which would justify the filing of a motion to suppress." *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 208, quoting *State v. Gibson,* 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). "'Even if some evidence in the record supports a motion to suppress, counsel is still considered effective if counsel could reasonably have decided that filing a motion to suppress would have been a futile act.'" *State v. Moon,* 8th Dist. Cuyahoga No. 101972, 2015-Ohio-1550, 2015 WL 1851496, ¶ 28, quoting *State v. Suarez,* 12th Dist. Warren No. CA2014–02–035, 2015-Ohio-64, 2015 WL 135434, ¶ 13; *State v. Witherspoon,* 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, 2011 WL 550124, ¶ 33 ("[t]he failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel and is not prejudicial.").

### a. The Interview Videotape

{¶ 167} Durham argues that his statement was used against him to show that Durham may have been lying about speaking with Coleman shortly before his death. Statements made by a suspect may not be used in evidence where those statements were made during a custodial interrogation unless *Miranda* warnings were properly given to the suspect. *State v. Andrews,* 3d Dist. Allen No. 1–05–70, 2006-Ohio-3764, 2006 WL 2044942, citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant argues that counsel was ineffective by failing to file a motion to suppress the statement because Durham was not *Mirandized.*

{¶ 168} A court must look at the totality of the circumstances in order to determine whether an individual is in custody at any given time. *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). *Id.* at 1125, 103 S.Ct. 3517. *Miranda* warnings are required where an individual is subject to custodial interrogation, defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Miranda* at 444, 86 S.Ct. 1602.

{¶ 169} Interrogation is defined as any "statement, question or remark by a police officer * * * reasonably likely to elicit an incriminating response * * *." *In re Forbess,* 3d Dist. Auglaize No. 2–09–20, 2010-Ohio-2826, 2010 WL 2488064, citing *State v. Knuckles,* 65 Ohio St.3d 494, 605 N.E.2d 54 (1992), paragraph two of the syllabus. "[A] person is considered in custody for purposes of *Miranda* when he is placed under

40

formal arrest or his freedom of action is restrained to a degree associated with a formal arrest." *Id.,* citing *State v. Simpson,* 10th Dist. Franklin No. 01AP–757, 2002-Ohio-3717, 2002 WL 1625559. The appropriate inquiry for determining if an individual has been placed in custody is whether, under the totality of the circumstances, a reasonable person would believe he is not free to leave. *State v. Gumm,* 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995), citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

{¶ 170} According to the record, Durham entered the police car voluntarily after Officer McMahon asked him whether he would be willing to meet with homicide detectives. Testimony demonstrates the temperature was about 32 degrees so the officer's explanation about Durham waiting inside the police car pending a meeting with the homicide detectives was reasonable under the circumstances. Durham was not cuffed or restrained and was freely speaking on his cell phone. Officer Tate was doing paperwork in the front seat and Durham did not ask to exit the vehicle.

{¶ 171} Durham was taken to the police station for the interview for videotaping. *Miranda* warnings are not required simply because questioning takes place in a courthouse or police station. *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Upon a review of the videotape, Durham was quite conversational and voluntarily talked at length. Durham did not ask to terminate the interview, and he was in no way restrained. There was no confession to the crime. At the conclusion of the interview, he was returned to the Fourth District police station where Pankey picked him up. Thus, we do not find that, under a totality of the circumstances, a reasonable person would believe he was not free to leave. *Mendenhall* at 554, 100 S.Ct. 1870.

{¶ 172} We take note of the testimony by Detective Lynch that Durham was a person of interest and was taken to the station for a videotaped interview because of state law. However, we determine that, were we to conclude that a *Miranda* violation did occur, harmless error applies:

> An error in the admission of evidence is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction. *State v. Lytle,* 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), at paragraph three of the syllabus. "Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams* (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323, paragraph six of the syllabus.

41

*State v. Jeffries,* 8th Dist. Cuyahoga No. 76905, 2000 WL 1222012, *3–4 (Aug. 24, 2000).

{¶ 173} There is overwhelming evidence in the record of Durham's presence at the property with Coleman as we have detailed in the sufficiency and manifest weight discussion herein. The cell tower evidence, supplemented by witness testimony, demonstrated Durham's stationary presence at the property until approximately 8:00 p.m. The O'Reilly videotape showed Durham's vehicle at the Lee and Miles intersection at approximately 7:55 p.m., concurrently with the vehicles of the witnesses that testified he was at the property. Cell phone records for the phones of Coleman and Durham show that Coleman talked with Durham briefly at 7:34 p.m. The record supports that any error for purposes of *Miranda* was harmless, and that Durham suffered no prejudice thereby.

### b. The Vehicle

{¶ 174} The second component of the ineffective assistance argument is trial counsel's failure to file a motion to suppress the evidence obtained from the Ford Taurus. The Fourth and Fourteenth Amendments to the United States Constitution, and Section 14, Article I, Ohio Constitution, prohibit governmental search and seizure without probable cause and a warrant, except for exceptional circumstances. Durham argues that the officers had no probable cause or specific articulable facts upon which to base the seizure of the vehicle.

{¶ 175} Detective Lynch testified that officers observed Durham drive up to the property in the Ford Taurus. Based on information provided by witnesses at the scene, they were aware that Durham was alleged to be the person who had last seen Coleman alive and that Durham was driving the Ford Taurus at the time, placing the vehicle at the crime scene.

{¶ 176} The authorities decided to "process-tow" the vehicles of Durham and Coleman. Detective Lynch explained the process-tow policy and procedure employed by the CPD and the documentation of the tow on the processing form, state's exhibit No. 292. The vehicle is towed to a specific impound lot where it is placed inside of a building and is not touched or entered by anyone. There is an exterior hook-up to the tow truck so that no driver or officer enters the vehicle, and a zone car follows the tow truck to the impound building.

{¶ 177} The vehicle remains enclosed in the property until it is searched. The purpose of the process tow is preservation of evidence. The first page of the tow sheet includes a list of the types of evidence to be tested for. Additional pages document the testing and who conducts the

processing. Durham's vehicle was not searched until a warrant was obtained on April 18, 2014.

{¶ 178} This court addressed the legality of a vehicle seizure to protect evidence pending the issuance of a search warrant in *State v. Collins,* 8th Dist. Cuyahoga No. 95415, 2011-Ohio-3241, 2011 WL 2566386. In *Collins,* four siblings under the age of 13 died of asphyxiation in an gasoline-fueled arson fire. *Id.* at ¶ 4. Collins's co-defendant ultimately confessed to police that he accompanied Collins the night of the fire and witnessed Collins enter the property with gasoline and run out. He also saw Collins set a car on fire. *Id.* at ¶ 12.

{¶ 179} Collins was seen driving a blue Saab on the night of the fire. When Collins's sister went to the police station in a blue Saab, the police ran the license plate and discovered that a third party owned the vehicle, not Collins. Subsequent to Collins's arrest, the police located and impounded the vehicle and, after obtaining a warrant, tested it for traces of gasoline. The car's back seat mats tested positive for gasoline. *Id.* at ¶ 16. The police obtained a warrant and tested the interior for gasoline.

{¶ 180} Collins filed a motion to suppress the "seizure" of the vehicle. *Id.* This court held:

> [T]he search was not unlawful because the officers did not search the vehicle until after they had obtained a search warrant. Thus, the only basis for challenging the search of the vehicle was the seizure of the vehicle prior to the search. While Collins contended at the suppression hearing that the car was parked in his driveway when it was towed, in his suppression motion he stated the car was parked on the public street. Regardless of where the car was located when it was towed, the officers had probable cause to seize the vehicle. Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). If there is probable cause to search a motor vehicle, it is reasonable under the Fourth Amendment for police to either seize the vehicle and hold it before presenting the probable cause issue to a magistrate or to carry out an immediate warrantless search. *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Prior to seizing the car, the officers had arrested Collins for setting the fire. They had also been told by several people that Collins was driving the blue Saab around the time of the fire. This knowledge was sufficient to warrant a belief that the vehicle contained evidence of Collins's involvement in the crime.

Moreover, obtaining a warrant prior to seizing the vehicle would create delay. Given the fact the car could easily be moved and any evidence contained within destroyed, it was prudent for the officers to seize the vehicle. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The officers minimized the intrusion by waiting to search the car until after a search warrant was obtained.

*State v. Collins,* 8th Dist. Cuyahoga No. 95415, 2011-Ohio-3241, 2011 WL 2566386, ¶ 18–19.

{¶ 181} Witnesses told authorities at the crime scene that Durham was the last person seen with Coleman at the property and that Durham drove a Ford Taurus. Durham returned to the crime scene in the Ford Taurus. "Given the fact that the car could easily be moved and any evidence contained within destroyed, it was prudent for the officers to seize the vehicle." *Id.* at ¶ 19.

{¶ 182} Durham has failed to demonstrate that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble, Strickland v. Washington,* both *supra.* Appellant's third assignment of error is overruled.

*State v. Durham*, 2016-Ohio-691, 60 N.E.3d at 577-81.

In assessing claims of ineffective assistance of counsel, courts apply the familiar standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1998), which requires a petitioner to demonstrate both that his counsel's performance was deficient, and that the allegedly ineffective assistance caused him prejudice:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

44

*Strickland*, 466 U.S. at 687.

Where, as here, a state court correctly identifies *Strickland* as the standard for assessing a petitioner's ineffective assistance claim, in order for the petitioner to receive habeas relief, the state court's ruling must be an unreasonable application of the *Strickland* standard. *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("The question is not whether a federal court believes the state court's determination under *Strickland* was incorrect but whether that determination was unreasonable—a substantially higher threshold.") (internal quotation marks omitted). When reviewing a state court's ruling on an ineffective assistance of counsel claim, federal habeas courts must employ "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, ⸻ U.S. ⸻, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013); *see also Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) ("Our review of the [state court's] decision is thus doubly deferential. We take a highly deferential look at counsel's performance through the deferential lens of § 2254(d).") (internal citations and quotation marks omitted).

Here, the state appellate court determined Durham's trial counsel was not ineffective for failing to file a motion to suppress his three-hour interview with homicide detectives conducted without a *Miranda* warning and the search and seizure of Durham's vehicle. Even if there had been a *Miranda* violation, it constituted harmless error given the other evidence in the case and Durham suffered no prejudice.

"Failure to file a motion to suppress may be ineffective assistance." *U.S. v. Thomas*, 38 F. App'x 198, 201 (6th Cir. 2002) (citing *Kimmelman v. Morrison*, 477 U.S. 365 (1986)). But counsel's "failure to file a suppression motion is not ineffective assistance *per se*." *Id.* (citing *Kimmelman*, 477 U.S. 365). Where a motion to suppress would not have succeeded, counsel is not guilty of ineffective assistance in choosing not file such a motion. *Id.* at 203 (citing *Worthington v. U.S.*, 726 F.2d 1089, 1093-94 (6th Cir. 1984) (Contie, concurring)). *See also U.S. v. Carter*, 355 F.3d 920, 924 (6th Cir. 2004) ("Failing to make

a motion for a judgment of acquittal that had no chance of success fails both prongs."); *U.S. v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) ("We reject Hanley's first allegation of ineffective assistance of counsel because Hanley's counsel may have wisely decided not to pursue suppression motions that would have likely been futile in view of the government's access to co-defendants' statements following their guilty pleas.")

With this framework, the Court addresses each of Durham's two ineffective assistance of counsel claims in turn.

### a.  Durham's statement

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  The privilege against self-incrimination applies to the States through the Fourteenth Amendment.  *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).  The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  In *Miranda*, the Supreme Court held:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning ... [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 478–79.  *Miranda* warnings are intended to guard against the coercion inherent in a police-dominated environment where the interplay between interrogation and custody would "'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-

46

incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (quoting

*Miranda*, at 457–58, 86 S.Ct. 1602).

*Miranda* warnings are not required "simply because the questioning takes place in the station

house, or because the questioned person is one whom the police suspect."  *Oregon v. Mathiason*, 429 U.S.

492, 495 (1977).  "Miranda warnings are required only where there has been such a restriction on a

person's freedom as to render him 'in custody.'"  (*Id.*)  The *Miranda* custody test is an objective one.

*Yarborough v. Alvarado*, 541 U.S. 652, 667 (U.S. 2004).  Under the *Miranda* custody test:

> "Two discrete inquiries are essential to the determination: first, what
> were the circumstances surrounding the interrogation; and second, given
> those circumstances, would a reasonable person have felt he or she was
> not at liberty to terminate the interrogation and leave.  Once the scene is
> set and the players' line and actions are reconstructed, the court must
> apply an objective test to resolve the ultimate inquiry: was there a formal
> arrest or restraint on freedom of movement of the degree associated with
> a formal arrest."

*Id.* at 663 (quoting *Thompson v. Keohane*, 516 U.S. 99 (1995)).

Relying on United States Supreme Court precedent,[7] the state appellate court reasonably

determined there was no prejudice – and therefore no *Strickland* violation – in Durham's trial counsel

failing to file a motion to suppress his statement when Durham was not in custody at the time he made his

statement to police, and even if there was a *Miranda* violation, given the other evidence in the case, any

error was harmless.  As the state appellate court correctly noted, Durham entered the police car

voluntarily, the temperature outside was cold and having Durham wait inside a zone car while waiting to

speak to homicide detectives was reasonable under the circumstances, he was not cuffed or restrained, he

spoke on his cell phone, and he never asked to exit the vehicle.  *State v. Durham*, 2016-Ohio-691, 60

---

[7] While the state appellate court did not cite to *Yarborough*, citing instead to *California v. Beheler*, 463
U.S. 1121 (1983) and *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (*State v. Durham*, 2016-
Ohio-691, 60 N.E.3d at 578-79), Durham makes no argument the state appellate court utilized the wrong
precedent in its analysis or that the tests used by the state appellate court and/or the result of those tests are
inconsistent with the objective test set forth in *Yarborough*.

N.E.3d at 578-79.  At the station, Durham was "quite conversational and voluntarily talked at length," he was not restrained during the interview, he never asked to end the interview, he made no confession to the crime, and after the interview he was released.  *Id.*

Furthermore, as the state appellate court correctly found, "There is overwhelming evidence in the record of Durham's presence at the property with Coleman as we have detailed in the sufficiency and manifest weight discussion herein."  *Id.* at 579.  Durham argues, "Here, the government cannot prove beyond a reasonable doubt that the evidence it presented regarding Mr. Durham's statements to the police on April 15, 2014 did not contribute to the verdict obtained.  To the contrary, the government relied extensively on those statements in proving its case against [Durham]."  (Doc. No. 9 at 13.)  But that is not the standard for prejudice under *Strickland* – it is Durham who must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  In light of other evidence at trial, including cell phone tower data, cell phone records, videotape of Durham's vehicle leaving the property at approximately 7:55 p.m. (*State v. Durham*, 2016-Ohio-691, 60 N.E.3d at 579), as well as witness testimony, including testimony by Sandra Pankey that Durham attempted to coach her to provide an alibi for him and not provide the police with certain information (*see, e.g.*, Doc. No. 7-5 at 1052-56, 1095-99; 1118-1124; Doc. No. 7-6 at 1400-43), it was not unreasonable for the state appellate court to determine any error was harmless and Durham could not establish prejudice.  Therefore, the Court finds the state appellate court's determination that trial counsel was not ineffective in failing to file a motion to suppress Durham's statement was neither contrary to nor an unreasonable application of clearly established federal law under the doubly deferential standards of § 2254(d) and *Strickland*.

### b.  Durham's vehicle

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures.  *Chambers v. Maroney*, 399 U.S. 42, 51 (1970).  "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  *Kimmelman*, 477 U.S. at 375.

In *Chambers*, the United States Supreme Court explained: "[T]he Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution.  As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made."  399 U.S. at 51.  The Court found seizing and holding a car before presenting the probable cause issue to a magistrate reasonable under the Fourth Amendment.  *Id.* at 52.

In determining there was no ineffective assistance of counsel for failing to file a motion to suppress evidence obtained from Durham's vehicle, the state appellate court relied on the decision of *State v. Collins*, 2011-Ohio-3241, 2011 WL 2566386 (Ohio Ct. App. 2011), which cited to *Illinois v. Gates*, 426 U.S. 213, 238 (1983) and *Chambers*, 399 U.S. at 52.  *State v. Durham*, 2016-Ohio-691, 60 N.E.3d at 580.  As the state appellate court correctly noted, officers observed Durham arrive at the property in his vehicle, officers were aware Durham was said to be the person who had last seen Coleman alive, and officers were aware that Durham was driving the same vehicle at the time.  *Id.* at 579-80.  Durham's vehicle was "process-towed" according to Cleveland Police Department policy.  *Id.* at 579.  Durham's vehicle was not searched until after a warrant was obtained on April 18, 2014.  *Id.* at 580.  As a result, the state appellate court reasonably found it was "'prudent for the officers to seize the vehicle.'"  *Id.* at 581.  Therefore, any motion to suppress evidence from the vehicle would have been futile.  The Court finds the state appellate

court's determination that trial counsel was not ineffective in failing to file a motion to suppress evidence from Durham's vehicle was neither contrary to nor an unreasonable application of clearly established federal law under the doubly deferential standards of § 2254(d) and *Strickland*.

### V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DISMISSED IN PART and DENIED IN PART.

Dated:  June 30, 2020                                        *s/ Jonathan Greenberg*
                                                            Jonathan D. Greenberg
                                                            United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**